**REDACTED COPY**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CRIMINAL NO. |
| | § | |
| , | § | **SEALED INDICTMENT** |
| | § | |
| | § | [Violations: |
| CRISTOBAL VELASQUEZ (3), | § | 18 U.S.C. § 2; |
| a/k/a Little Cris | § | 18 U.S.C. § 1959(a)(1); |
| SOTERO RODRIGUEZ MARTINEZ (4), | § | 18 U.S.C. § 1959(a)(5); |
| a/k/a June | § | 18 U.S.C. § 1962(c); |
| CHUCO MARIO MARTINEZ (5), | § | 18 U.S.C. § 1962(d)] |
| a/k/a Mariachi | § | |
| LARRY MUNOZ, JR. (6), | § | |
| a/k/a Little Larry | § | |
| (7), | § | |
| | § | |
| BRIAN ESPARZA (8), | § | |
| a/k/a Tata | § | |
| CHARLES ESPARZA (9), | § | |
| a/k/a Horse | § | |
| ERVEY SANCHEZ (10), | § | |
| a/k/a Mad Max | § | |
| MARK ANTHONY VELA (11), | § | |
| 12), | § | |
| | § | |
| CHARLES OLAN QUINTANILLA (13), | § | |
| GEORGE SANCHEZ (14), | § | |
| a/k/a Curious, | § | |
| INEZ MATA, (15) | § | |
| a/k/a Bebito, | § | |

## DR11CR1781

### COUNT ONE

The Grand Jury charges:

### The Enterprise

1.   At various times relevant to this Indictment

, CRISTOBAL VELASQUEZ, SOTERO RODRIGUEZ

MARTINEZ, a/k/a "June," CHUCO MARIO MARTINEZ, a/k/a "Mariachi,"

LARRY MUNOZ, JR., a/k/a "Little Larry,"

BRIAN ESPARZA , a/k/a "Tata," CHARLES ESPARZA, a/k/a

"Horse," ERVEY SANCHEZ, a/k/a "Mad Max," MARK ANTHONY VELA,

CHARLES OLAN QUINTANILLA,

GEORGE SANCHEZ, a/k/a "Curious," INEZ MATA, a/k/a "Bebito," and

others known and unknown, were members and associates of the

Texas Syndicate, a criminal organization whose members and

associates engaged in acts of violence, including murder,

conspiracy to commit  murder, extortion and narcotics

distribution, and which operated principally in the Western

District of Texas.

2.   The Texas Syndicate, including its leadership,

membership and associates, constituted an "enterprise," as

defined by Title 18, United States Code, Section 1961(4), that

is, a group of individuals associated in fact.  The enterprise

constituted an ongoing organization whose members functioned as a

continuing unit for a common purpose of achieving the objectives

of the enterprise.  The enterprise (hereinafter "the Texas

Syndicate," "TS," or "the enterprise") was engaged in, and its

activities affected, interstate and foreign commerce.

3.   The Texas Syndicate originated in the early 1970's in

the California prison system as a response to other prison gangs

that were preying on native Texan inmates.  These Texas offenders

banded together for protection purposes and became known as one

of the most feared prison gangs within the California prison

system.  After being released from California prisons these
inmates returned to Texas, often returning to violence and
re-entering the prison system.  As a result, members were able to
expand their control throughout the Texas Department of Criminal
Justice (TDCJ) prison system.  Since the late 1970's, the TDCJ
has seen a gradual increase in TS-related activities within the
system and the Texas Syndicate remains one of the main security
threats within the TDCJ.

4.   TS rules are strictly enforced, primarily resulting in
violent attacks on and executions of TS members who violate
their rules.  Furthermore, that degree of control has carried to
communities in which TS members reside.  Once out of prison, many
TS members continue to commit violent offenses, narcotics-related
offenses, and other illegal activities in the area of the country
where the members are living and associating with each other.

5.   The gang is commonly referred to as *Sindicato Tejano*,
*Ese Te*, "Twisted Sister," "Teresa Sanchez" and *Cuernos*.  TS
membership is comprised predominantly of Texas-born Mexican-
American males and operates under a formal paramilitary
organizational structure with a constitution and strict
established rules.

6.   Texas Syndicate members frequently refer to each other
as *carnal* (brother) and maintain a distinct identity by
establishing and enforcing specific TS rules, holding meetings,
utilizing TS gang signs (horns), and by maintaining a close

relationship with fellow gang members and their associates throughout the state. Some, but not all, TS members have TS tattoos. These tattoos commonly include horns (*cuernos*, in Spanish), words containing the letters "T" and "S," or various objects in the shape of a "T" and an "S." Members consider it to be an offense against the organization for a nonmember to have a TS tattoo or to assert membership in the Texas Syndicate prior to becoming a full member. Although obtaining TS-related tattoos was once a common practice, some TS members now avoid obtaining tattoos in order to shield their association with the TS from law enforcement. This allows members to function with less oversight, especially within the prison system.

7.   Members of the TS are bound by a set of strict rules which ensure loyalty to and participation in the enterprise's criminal activities. The rules require that a member continue his participation in the enterprise's criminal activities while in prison. The rules also require that a member continue his participation in the organization upon his release from prison. After release from prison, a TS member is required to contact the high-ranking member in the geographical area where the released member intends to reside. No member is permitted to break away from the group. Membership is for life. Any violation of the rules may result in harsh penalties, including death. A member who violates the rules and loses favor becomes a *muleta*, a term which is used to mean "a problem." Such a violation may result

in the TS bringing its own official gang-based charges against the member who is being accused of violating the rules.  The strict rules and harsh discipline governing the Texas Syndicate help insure that the organization's members and associates function as a continuing unit despite any changes in membership.

8.   The rules of the Texas Syndicate prohibit the distribution of information regarding fellow members to law enforcement.  Texas Syndicate members, therefore, generally attempt to conceal their association with the TS from law enforcement.  If several TS members commit a crime, it is not uncommon for one member to demonstrate his loyalty by taking responsibility for the crime in order to shield other TS brothers from the attention of law enforcement.  TS members will also assist a fellow member in his pending criminal case.  A TS member will attempt to discover the evidence that will be used against the fellow member or discover the names of the witness or witnesses who will provide testimony in trial.

9.   The TS rules provide that the TS is to come before family.  *Carnales* make sure that the rules are known.  It is understood that members and prospects of the TS may receive a telephone call and instructions to commit a crime including homicide for the Texas Syndicate at any time.  Regardless of the member's friendship or association with the victim, the orders are to be carried out since the rules mandate that the TS comes first, even before family.  The soldiers and prospects

(*prospectos* in Spanish) are often used to carry out violent TS business.  Sometimes, members who have a problem or *muleta* that they need to work off in order to achieve better status with the TS are called upon to perform the ordered task.  The task would range from a serious assault to murder.  The TS will not hesitate to kill anyone who interferes with the business of the gang or who commits a violation of Texas Syndicate rules.

10.   Members of the Texas Syndicate regularly held meetings (sometimes referred to as "barbeques" or *juntas*) where members would discuss and vote on important decisions.  Prospects were generally not allowed to make decisions or be present inside the meetings and were required to stand outside when such decisions were made.  However, prospects stood ready to carry out decisions made at these meetings as this would help improve their status in the organization.

11.   Members of the Texas Syndicate maintain regular communication with members who have been imprisoned.  Such communication is often through letters and telephone calls. Coded language is frequently utilized in order to mislead law enforcement as to the true message contained in the letters or telephone calls.  This coded language is often hidden in an otherwise meaningless letter or telephone call.  Examples of coded language indicating that someone is to be eliminated include putting an "X" over the name of the individual or by referring to this targeted individual as "X."  Additionally, TS

members will state that this targeted individual has a "green light," or has been designated as a problem *(muleta)*. A member who has fallen out of favor might also be referred to in the feminine form. Rival gang members may also be referred to in the feminine form. If a *muleta* is ordered, the TS will refer to this *muleta* or order as having a "green light."

12. The Texas Syndicate's control of those in prison is so far-reaching that members both in and out of prison follow a procedure by which the TS ensure that members are not and have not been police informants. The procedure is referred to as "clearing" a TS member or "running the lights." Members in prison were "cleared" by exhibiting documentation such as plea agreements, presentence investigation reports, judgments or other case-related document, to enable higher-ranking members to verify that the person to be "cleared" did not cooperate with law enforcement.

13. Coded language was commonly utilized during drug related phone calls. Cocaine might be referred to by many names including "sheet rock," "girls," "teenager," "teener," "french fries," "bacon," "white shirt" and "flour." Marijuana might be referred to by names including "elbows," "feed," "stuff for horses," "hay for horses," "green" and "grass." Methamphetamines were commonly referred to as "ice," "crystal," "windshields," "the cold stuff" and "yellow." Suppliers and customers would also use abbreviated numbers to indicate quantity and price, such

as an order for "a whole onion" that cost at least "7 bucks," meaning that an order of an ounce of cocaine would cost $700. When cocaine was available, the supplier might tell his customers that he had "work" available.  The quality of cocaine was frequently discussed in terms of how "pretty" or "how good the girls are."  Payments for drugs were often called "receipts" and "cheese."

14.  The power of the Texas Syndicate is utilized to create fear and intimidation that shields members, ensures the timely payment of drug debts, and prevents the theft of members' drugs or money.  Violent retribution is an important activity of the enterprise.  Such retribution helps enforce loyalty to the organization which is necessary for ensuring the smooth running of the drug distribution business as well as maintaining discipline within the enterprise.  Members and prospects are made aware that the affiliation with the TS requires their assistance with the criminal activity of the enterprise when called upon to do so and is an important step toward obtaining higher status in the organization.

### Purposes of the Enterprise

15.  The purposes of the enterprise included the following:

a.   Enriching the members and associates of the enterprise through, among other things, distribution of narcotics, extortion and robbery.

b.   Preserving and protecting the power, territory and

profits of the enterprise through the use of intimidation, violence, threats of violence, assaults and murder.

     c.  Promoting and enhancing the enterprise and its members' and associates' activities.

     d.  Maintaining a powerful organization that could protect members and provide financial opportunities through criminal activity.

     e.  Keeping victims in fear of the enterprise and in fear of its members and associates through threats of violence and violence.

16.  Pursuant to this objective, members acted to protect each other and to build a strong, disciplined organization through intimidation and violent retribution against outsiders and through strict and harsh discipline of members and associates who violated the rules and goals of the enterprise.

### Roles of the Defendants

17.  The defendants participated in the operation and management of the enterprise using an established hierarchy.

     a.  Although the Texas Syndicate is a national organization with central governing rules, including a constitution, members developed geographical groups to better serve the criminal aims of the organization.  Each of these geographical groups has some autonomy in deciding how they will achieve their criminal aims, as long as they do not stray too far from the governing rules of the organization.

b.  The enterprise has a hierarchy for making decisions.  There is a *Sillon* or Chairman for each region or institution who oversees, supervises, directs, and authorizes all TS activities for that region and institution.

c.  A Lieutenant acts as an advisor or assistant to the *Sillon* and other ranking members.

d.  Sergeants enforce rules and collect votes when instructed.

e.  The following Defendants were leaders of the enterprise who, at various times during the racketeering conspiracy, directed other members of the enterprise in carrying out unlawful and other activities in furtherance of the conduct of the enterprise's affairs:

> **SOTERO RODRIGUEZ MARTINEZ, a/k/a "June,"** currently a *carnal* in the Texas Syndicate after being removed from the *Sillon* position in June, 2011;
> **CHUCO MARIO MARTINEZ, a/k/a "Mariachi,"** currently a *carnal* in the Texas Syndicate who served as Lieutenant from October 2010 until his removal in June, 2011;
> **LARRY MUNOZ, JR., a/k/a "Little Larry,"** a Lieutenant in the Texas Syndicate as of June 2011;
> currently a *carnal* in the Texas Syndicate  who previously held the position of *Sillon;*
> **BRIAN ESPARZA, a/k/a "Tata,"** a Lieutenant in the Texas Syndicate until October 24, 2010;
> **INEZ MATA, a/k/a "Bebito,"** currently a *carnal* in the Texas Syndicate who previously held the position of Sergeant for approximately ten years until his removal in June, 2011.

f.  Under the direction of the leaders of the enterprise, the defendants

, CRISTOBAL VELASQUEZ, a/k/a "Little Cris," CHARLES ESPARZA, ERVEY SANCHEZ, a/k/a "Mad Max," MARK ANTHONY VELA, " and GEORGE SANCHEZ, a/k/a "Curious," participated in unlawful and other activities in furtherance of the conduct of the enterprise's affairs.

g.  Soldiers are the non-ranking members who carry out many of the criminal activities.

h.  Prospects or *prospectos* are individuals attempting to become a Soldier or *Cuerno*.

i.  TS members, from the *Sillon* to Soldiers, are commonly referred to as a *Cuerno* (Spanish for horn) and refer to each other as *carnal* meaning brother in colloquial Spanish.

j.  "Stores" is a term used by the TS to refer to the individuals (members, prospects and/or associates) who sell user amounts of various drugs with TS authorization and under the responsibility of the *Sillon* in each area.

k.  Individuals who perform work for the Texas Syndicate, but are not members or prospects, are referred to as associates.

l.  Members of the enterprise who carried out unlawful and other activities in furtherance of the conduct of the enterprise's affairs included:

CRISTOBAL VELASQUEZ, a/k/a "Little Cris," currently a

*carnal* in the Texas Syndicate;
**CHARLES ESPARZA, a/k/a/ "Horse,"** currently a *carnal* in the Texas Syndicate;
**ERVEY SANCHEZ, a/k/a "Mad Max,"** currently a *carnal* in the Texas Syndicate;
**MARK ANTHONY VELA** currently a prospect of the Texas Syndicate;


**GEORGE SANCHEZ, a/k/a "Curious,"** currently a *carnal* in the Texas Syndicate;
**CHARLES OLAN QUINTANILLA,** currently an associate of the Texas Syndicate.

### Means and Methods of the Enterprise

18.   Among the means and methods by which the defendants and their associates conducted and participated in the conduct of the affairs of the enterprise were the following:

a.   Members of the enterprise and their associates trafficked in marijuana, cocaine and methamphetamine.

b.   Members of the enterprise and their associates used, attempted to use, and conspired to use extortion and robbery, which affected interstate commerce.

c.   Members of the enterprise and their associates committed, attempted and threatened to commit acts of violence, including murder and extortion, to protect and expand the enterprise's criminal operations.

d.   Members of the enterprise and their associates promoted a climate of fear through violence and threats of violence.

e.   Members of the enterprise and their associates used and threatened to use physical violence against various

individuals both inside and outside of the enterprise.

## The Racketeering Conspiracy

19.  From in or about and January 1, 2002 through the date
of this Indictment, both dates being approximate and inclusive,
within the Western District of Texas and elsewhere, the
defendants,                              CRISTOBAL VELASQUEZ,
SOTERO RODRIGUEZ MARTINEZ, a/k/a "June," CHUCO MARIO MARTINEZ,
a/k/a "Mariachi," LARRY MUNOZ, JR., a/k/a "Little Larry,"
BRIAN ESPARZA , a/k/a "Tata,"
CHARLES ESPARZA, a/k/a "Horse," ERVEY SANCHEZ, a/k/a "Mad Max,"
MARK ANTHONY VELA,
CHARLES OLAN QUINTANILLA, GEORGE SANCHEZ, a/k/a "Curious," and
INEZ MATA, a/k/a "Bebito," together with other persons known and
unknown, being persons employed by and associated with the Texas
Syndicate, an enterprise, which engaged in, and the activities of
which affected, interstate and foreign commerce, knowingly, and
intentionally conspired to violate 18 U.S.C. § 1962(c), that is,
to conduct and participate, directly and indirectly, in the
conduct of the affairs of the enterprise through a pattern of
racketeering activity involving multiple acts involving the
distribution of narcotic drug controlled substance including
cocaine, marijuana, and methamphetamine, in violation of the laws
of the United States, Sections 841(a)(1) and (b)(1)(B) and 846 of
Title 21, United States Code, and 18 U.S.C. Section 1951
(Extortion), and multiple acts indictable under the following

state offenses:

      A.  Robbery, chargeable under Texas Penal Code, Section 29.02, 29.03, 15.01, 15.02, 15.03, 7.01 and 7.02; and

      B.  Murder, chargeable under Texas Penal Code, Section 19.02, 15.01, 15.02, 15.03, 7.01 and 7.02;

20.  It was a further part of the conspiracy that the defendants agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

<u>Overt Acts</u>

21.  In furtherance of the racketeering conspiracy, and to effect the objects thereof, the defendants and their co-conspirators committed and caused to be committed the following overt acts, among others, on or about the following dates, in the Western District of Texas and elsewhere:

22.  On or about October 13, 2002,       and a person known to the Grand Jury were responsible for distributing a large amount of the narcotics moving between Uvalde and Austin, Texas.

23.  On or about October 13, 2002, members of the Texas Syndicate met and decided to kill Rogelio Mata.

24.  On October 13, 2002, Mata was seen leaving a store with       and three other men, all of whom were identified as being members of the Texas Syndicate.

25.  On or about October 13, 2002,       and a

person known to the Grand Jury drove Rogelio Mata outside Uvalde, Texas where they shot and killed Mata.

26.  On or about December 23, 2005, members of the Texas Syndicate met and decided to kill Jose Guadalupe De la Garza.

27.  On December 23, 2005, **CRISTOBAL VELASQUEZ, CHUCO MARIO MARTINEZ** and persons known to the Grand Jury assaulted Domingo Guadalupe Guajardo in order to intimidate his father and the family.

28.  On December 23, 2005, **CRISTOBAL VELASQUEZ, CHUCO MARIO MARTINEZ** and persons known to the Grand Jury committed a burglary at the home Jose Guadalupe De la Garza located in Uvalde, Texas, by forcefully entering the home and assaulting Domingo Guadalupe Guajardo, De la Garza's son.

29.  On December 23, 2005, **CHUCO MARIO MARTINEZ** placed a knife to the throat of Domingo Guadalupe Guajardo and said, "you wanted a war, you got a war," referring to the trouble which a member or associate could face when that person distributes narcotics to rival gangs.

30.  On December 25, 2005, a person known to the Grand Jury was seen approaching the home of Jose Guadalupe De la Garza while holding a firearm moments before gunshots were heard at the De la Garza home.  Moments later, that person shot and killed Jose Guadalupe De la Garza with a firearm.

31.  On December 25, 2005, **CRISTOBAL VELASQUEZ** and others known to the Grand Jury were seen driving away from Jose

Guadalupe De la Garza's home moments after De la Garza's murder.

33.  On or about August 12, 2009, **LARRY MUNOZ, JR.** and **BRIAN ESPARZA** were recorded discussing TS-related business involving having a TS member "cleared," referring to ensuring that a member is in good standing with the Texas Syndicate and not a police informant.

34.  On or about August 23, 2009, **LARRY MUNOZ, JR.** and **SOTERO RODRIGUEZ MARTINEZ** were recorded discussing TS-related business involving the status of a TS member in another correctional facility.  In the course of this conversation, **MUNOZ** asked that **RODRIGUEZ MARTINEZ** report back on the status because

**MUNOZ** received instructions to inquire.

35.  On or about November 9, 2009, members of the Texas Syndicate met and decided to kill Jesse James Polanco because they believed he was a police informant.

36.  On or about November 9, 2009, acting on the TS decision to kill Jesse James Polanco, **ERVEY SANCHEZ** shot and killed Jesse James Polanco.

37.  On or about January 24, 2010, the purchase of one quarter-pound of marijuana was negotiated with **MARK ANTHONY VELA** for $150 by a person known to the Grand Jury.

38.  On or about February 13, 2010, members of the Texas Syndicate met and decided to threaten a person known to the Grand Jury, thereby forcing that person to rob a bank in order to pay money to the Texas Syndicate.

39.  On or about February 13, 2010, **SOTERO RODRIGUEZ MARTINEZ,** who was then the *Sillon* for the Texas Syndicate, and **GEORGE SANCHEZ** directed a person known to the Grand Jury to rob a bank.

40.  On or about February 16, 2010, a person known to the Grand Jury robbed the IBC Bank located inside the HEB located at 201 East Main Street in Uvalde, Texas, as directed by **SOTERO RODRIGUEZ MARTINEZ** and **GEORGE SANCHEZ**, taking approximately $3,110 in U.S. currency.

41.  On or about April 19, 2010,                     was intercepted discussing TS-related business while

was incarcerated.  In the course of this conversation,
            also discussed contact with a person known to the Grand
Jury and "Africa," which is identified as the Texas Department of
Criminal Justice's Coffield Unit, the unit housing the highest ranking
TS members.

    42.  On or about April 19, 2010,                and **SOTERO**
**RODRIGUEZ MARTINEZ** were intercepted in a telephone call during
which                gave **MARTINEZ** advice on how to "handle"
another TS member.  In the course of this conversation,
told **MARTINEZ** to send the unknown male a message and added that
            was doing time for a *muleta* and for the *cuerno*.

            added that the unknown male was taking "stuff that is
mine."

    43.  On April 20, 2010,                and **SOTERO RODRIGUEZ**
**MARTINEZ** were intercepted in a telephone call during which
**MARTINEZ** asked            whether the TS had an open line from his
unit to "Africa," to which            replied that there is.
"Having an open line" refers to the ability of TS members in
            's unit to communicate with TS members in the Texas
Department of Criminal Justice's Coffield Unit, which is the unit
housing the highest ranking TS members.

45.  On or about June 19, 2010,                    and **LARRY MUNOZ, JR.,** were intercepted in a telephone call during which **MUNOZ** inquired whether a TS member from Corpus Christi, Texas, was a *muleta* which needed to be dealt with by murder, to which replies "yeah."

48.  On or about July 8, 2010,                    and                    were intercepted in a telephone call during which they discussed TS-related activity and events which occurred at a recent meeting.  In the course of the conversation,                    reported to                    that someone had received a *muleta*.                    then inquired about the issues expected to be presented at the next meeting and added that **SOTERO RODRIGUEZ MARTINEZ** should be removed from his position as *Sillon*.

49.  On or about August 14, 2010, members of the Texas Syndicate held a meeting during which **SOTERO RODRIGUEZ MARTINEZ, LARRY MUNOZ, JR.,**                , **BRIAN ESPARZA, CHARLES ESPARZA, GEORGE SANCHEZ** and **INEZ MATA** decided and agreed to kill Ramon Rodriguez, a/k/a "Spider."

50.  On or about August 27, 2010, text messages were intercepted between **MARK ANTHONY VELA** and an unknown individual wherein the unknown individual sent a text message to **VELA** which said, "need 7 yards of concrete poured today," referring to needing seven ounces of cocaine.

51.  On or about August 31, 2010, 4.024 ounces (111.6 grams) of cocaine was purchased from **MARK ANTHONY VELA** and
         by a person known to the Grand Jury.

52.  On or about September 9, 2010, **MARK ANTHONY VELA** was intercepted receiving a text message from an unknown individual using coded language.  The text message said, "Prim how much would u charge me for 4 hole yards and 3 quarters," referring to four and three-quarter ounces of cocaine.

53.  On or about September 9, 2010, **MARK ANTHONY VELA** was intercepted sending a text message to a person known to the Grand Jury using coded language.  The unknown individual had inquired about the price of four and three-quarter ounces of cocaine. **VELA** responded by saying, "Gv me 7 4 each hole n I giv u da 3qtr 4 4dollars wch eme out 2 32," referring to a price quote of $700 per ounce and $400 per three-quarter ounce, totaling $3,200 in

U.S. currency.

54.   Between August and September, 2010, **MARK ANTHONY VELA** was acting as a drug distributor to a person known to the Grand Jury, an associate of the Texas Syndicate.

55.   Between August and September, 2010, **MARK ANTHONY VELA** gave a person known to the Grand Jury an undetermined amount of drugs, but the person known to the Grand Jury failed to pay **VELA** for the drugs within a certain period of time.

56.   On or about September 9, 2010, text message were intercepted between **MARK ANTHONY VELA** and a person known to the Grand Jury wherein they negotiated the sale of four and three-quarter ounces of cocaine using coded language.  In the course of the conversation in text, **VELA** quoted a price of $700 for each ounce and $400 for the three-quarter ounce.

57.   On or about September 17, 2010, **MARK ANTHONY VELA** and **CHARLES OLAN QUINTANILLA** were intercepted in a phone call wherein they discussed marijuana using coded language.

58.   On or about September 18, 2010, **MARK ANTHONY VELA** pressured a person known to the Grand Jury to pay **VELA** for the narcotics **VELA** had previously provided to the known person and elicited the help of                and **CHARLES OLAN QUINTANILLA** to do the same.

59.   On or about September 18, 2010, **MARK ANTHONY VELA** and **SOTERO RODRIGUEZ MARTINEZ** were intercepted in a phone call

wherein they discussed narcotics using coded language.  In the course of this conversation, **VELA** asked whether **MARTINEZ** needed marijuana that evening to sell, to which **MARTINEZ** replied that he did.

60.  On or about September 22, 2010, **MARK ANTHONY VELA** and **CHUCO MARIO MARTINEZ** were intercepted in a phone call wherein they discussed narcotics using coded language.  In the course of this conversation, **VELA** promised to provide **CHUCO MARIO MARTINEZ** with a better product and would supply **CHUCO MARIO MARTINEZ** with "a whole one," referring to supplying **MARTINEZ** with one pound of marijuana.

61.  On September 22, 2010, **MARK ANTHONY VELA** threatened to stop providing narcotics to a person known to the Grand Jury until that person paid the entire amount of the outstanding debt, $500 in U.S. currency.

62.  On or about September 22, 2010, a TS associate known to the Grand Jury and a known individual were intercepted in a phone call wherein they discussed obtaining an "8" (an eighth of an ounce of cocaine) and cutting it in half so that each of them would have a sixteenth of an ounce.  The conversation revealed that their narcotics supplier was

63.  On or about September 24, 2010, a person known to the Grand Jury and **MARK ANTHONY VELA** were intercepted in a phone call wherein they discussed narcotics using coded language.  In the course of the conversation, the person known to the Grand Jury

asked that **VELA** supply the known person with two-sixteenths of an ounce of cocaine to sell and a small bag of cocaine for the known person's personal use.

64.  On or about September 29, 2010, **MARK ANTHONY VELA** and **CHUCO MARIO MARTINEZ** were intercepted in a phone call wherein they discussed narcotics using coded language.  In the course of the conversation, **MARTINEZ** discussed being ready to pay **VELA** for approximately three pounds of marijuana and added that **MARTINEZ** had a customer who requested three additional pounds for purchase.  **MARTINEZ** agreed to drive to Medina County and pick up the marijuana from **VELA**.  Surveillance revealed that **MARTINEZ** and **VELA** met in Medina County that evening.

65.  On or about October 2, 2010, 1.99 pounds of marijuana was seized from a person known to the Grand Jury after he agreed to transport the marijuana for **MARK ANTHONY VELA**.

67.  On or about October 9, 2010, **CHARLES OLAN QUINTANILLA** and a person known to the Grand Jury were intercepted in a phone call wherein they discussed the distribution of cocaine using

coded language.  In the course of the conversation, QUINTANILLA said that others wanted to purchase cocaine from him at a discounted price.  QUINTANILLA added that he was not "the big guy," and that QUINTANILLA would have to pay the "big guy" money for his supply, referring to TS prospect MARK ANTHONY VELA, who supplied large quantities of narcotics to TS members and associates for distribution.

68.  On or about October 16, 2010, SOTERO RODRIGUEZ MARTINEZ and CHUCO MARIO MARTINEZ were intercepted in a phone conversation wherein they discussed drug trafficking activities using coded language.  In the course of the conversation, they also discussed whether CHUCO MARIO MARTINEZ had received a cocaine shipment.

69.  On or about October 16, 2010, SOTERO RODRIGUEZ MARTINEZ and CHUCO MARIO MARTINEZ were intercepted in a phone conversation wherein they discussed narcotics using coded language.  In the course of the conversation, CHUCO MARIO MARTINEZ told SOTERO RODRIGUEZ MARTINEZ that he would deliver to SOTERO RODRIGUEZ MARTINEZ "stuff" and later used the word "pot," referring to marijuana.

70.  On or about October 22, 2010, SOTERO RODRIGUEZ MARTINEZ and a person identified as "Chopper" were intercepted in a phone conversation wherein they discussed narcotics using coded language.  In the course of the conversation, "Chopper" asked to purchase marijuana from MARTINEZ so "Chopper" could then sell it.

MARTINEZ agreed to supply "Chopper" with marijuana once he received a shipment and quoted a price of $550 and $600 per pound.

71.  On or about October 29, 2010, **SOTERO RODRIGUEZ MARTINEZ** and **CHUCO MARIO MARTINEZ** were intercepted in a phone conversation wherein they discussed narcotics using coded language.  In the course of the conversation, they discussed an opportunity to purchase marijuana at $400 per pound.  **CHUCO MARIO MARTINEZ** told **SOTERO RODRIGUEZ MARTINEZ** that he had seen the marijuana, and added that "it looked good."

72.  On or about November 2, 2010, during an intercepted telephone call, **SOTERO RODRIGUEZ MARTINEZ** and discussed a recent arrest of a woman.  In the course of the conversation,        said that the woman had been arrested for transporting thirty-three kilograms of cocaine and that she had been at        home just before departing on her trip.

73.  On or about November 4, 2010,                and **LARRY MUNOZ, JR.,** were intercepted in a phone conversation wherein they discussed Texas Syndicate leadership from Uvalde, events from a recent TS meeting, and a recent order to kill an unknown TS member.  In the course of the conversation,              advised **MUNOZ** on how to resolve some differences between **MUNOZ,**                , and persons known to the Grand Jury regarding an unpaid debt.        also advised **MUNOZ** to write to a person

known to the Grand Jury in order to explain the situation, and
added that he                would send out a message and
instruct other TS members on how to address a pending TS issue.

74.  On or about November 8, 2010, a telephone call
involving                and a person known to the Grand Jury were
intercepted wherein          discussed TS-related business
involving TS member **LARRY MUNOZ, JR.**  In the course of the
conversation,          and the known person discussed **MUNOZ**
having trouble with the TS.

75.  On or about November 10, 2010, a telephone call
involving                and a person known to the Grand Jury were
intercepted wherein          discussed TS-related business
involving TS members **LARRY MUNOZ, JR.** and **INEZ MATA**. In the
course of the conversation, they discussed clearing someone in
the TS, referring to an member being in good standing with the
TS.  Hernandez then reported that **MATA** did not want anyone
interfering with the clearing process.

76.  On or about November 17, 2010, a person known to the
Grand Jury purchased 2.1 grams of methamphetamine from **CHARLES
OLAN QUINTANILLA.**

78.  On or about November 30, 2010, a telephone call

involving                    , **LARRY MUNOZ, JR.**, and an unknown male
were intercepted wherein they discussed Texas Syndicate
leadership from both Uvalde and San Antonio, and related
activity.  While discussing TS-related activity, **MUNOZ** asked
          to give him a complete run down of TS business.

   79.  On or about December 5, 2010, a telephone call
involving            and **LARRY MUNOZ, JR.** were intercepted
wherein they discussed Texas Syndicate leadership, rules and its
recent activity.

   80.  On or about March 7, 2011, a person known to the Grand
Jury received a letter and photographs from **CHARLES ESPARZA** in
which **ESPARZA** reported TS-related business, including an decision
to kill someone.  **ESPARZA** wrote, "[t]he issue with [a person in
conflict with the TS] is being taking care of Lil Fats is on top
of that as we speak," referring to the plan to kill a person
known to the Grand Jury.

   81.  On or about August 12, 2011, a person known to the
Grand Jury purchased approximately fourteen grams of crystal
methamphetamine "ice" from TS prospect
**MARK ANTHONY VELA** assisted in coordinating the transaction.

   82.  On or about August 20, 2011, **ERVEY SANCHEZ** and
**CRISTOBAL VELASQUEZ** were intercepted discussing a fight in which
**VELASQUEZ** was involved the previous night.  **CRISTOBAL VELASQUEZ**
explained he, **SOTERO RODRIGUEZ MARTINEZ** and a person known to the

Grand Jury assaulted an unidentified male over a money issue.

83.  On or about September 2, 2011, **ERVEY SANCHEZ** and **CRISTOBAL VELASQUEZ** were intercepted having a conversation wherein **VELASQUEZ** agreed to accompany **SANCHEZ** to assault a person known to the Grand Jury over money owed to **SANCHEZ**.

All in violation of Title 18, United States Code, Section 1962(d).

**COUNT TWO**

Murder in Aid of Racketeering

The Grand Jury further charges:

84.  At all times relevant to this Indictment, the Texas Syndicate, as more fully described in Paragraphs One through Eighteen of Count One of this Indictment, which are re-alleged and incorporated by reference as though set forth fully herein, constituted an enterprise as defined in Title 18, United States Code, Section 1959(b)(2), namely the Texas Syndicate, that is, a group of individuals associated in fact which was engaged in, and the activities of which affected, interstate and foreign commerce.  The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

85.  At all times relevant to this Indictment, the above-described enterprise, through its members and associates, engaged in racketeering activity as defined in Title 18, United States

Code, Sections 1959(b)(1) and 1961(1), namely, multiple acts the

distribution of narcotic drug controlled substance including

cocaine, marijuana, and methamphetamine, in violation of the laws

of the United States, Sections 841(a)(1) and (b)(1)(B) and 846 of

Title 21, United States Code, and 18 U.S.C. Section 1951

(Extortion), and multiple acts indictable under the following

state offenses: Murder, chargeable under Texas Penal Code,

Section 19.02, 15.01, 15.02, 15.03, 7.01 and 7.02, Robbery,

chargeable under Texas Penal Code, Section 29.02, 29.03, 15.01,

15.02, 15.03, 7.01 and 7.02.

86.   On or about October 13, 2002, in the Western District

of Texas, as consideration for the receipt of, and as

consideration for a promise and an agreement to pay, anything of

pecuniary value from the Texas Syndicate, and for the purpose of

gaining entrance to and maintaining and increasing position in

the Texas Syndicate, an enterprise engaged in racketeering

activity,                                    and others known and

unknown, murdered Rogelio Mata, in violation of Texas Penal Code,

Sections 19.02 and 15.02.

All in violation of Title 18, United States Code, Sections

1959(a)(1) and 2.

### COUNT THREE

### Conspiracy to Commit Murder in Aid of Racketeering

87.   The allegations of Paragraphs Eighty-Four and Eighty

Five are hereby re-alleged and incorporated as if fully set forth

herein.

88.   On or about December 25, 2005, in the Western District of Texas, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the Texas Syndicate, and for the purpose of gaining entrance to and maintaining and increasing position in the Texas Syndicate, an enterprise engaged in racketeering activity, **CRISTOBAL VELASQUEZ, a/k/a "Little Cris," CHUCO MARIO MARTINEZ, a/k/a "Mariachi,"**                  , and others known and unknown, did conspire to murder Jose Guadalupe De la Garza, in violation of Texas Penal Code, Sections 19.02 and 15.02.

All in violation of Title 18, United States Code, Section 1959(a)(5).

### COUNT FOUR

### <u>Murder in Aid of Racketeering</u>

89.   The allegations of Paragraphs Eighty-Four and Eighty Five are hereby re-alleged and incorporated as if fully set forth herein.

90.   On or about December 25, 2005, in the Western District of Texas, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the Texas Syndicate, and for the purpose of gaining entrance to and maintaining and increasing position in the Texas Syndicate, an enterprise engaged in racketeering activity, **CRISTOBAL VELASQUEZ, a/k/a "Little Cris,"** and others

known and unknown, murdered Jose Guadalupe De la Garza, in violation of Texas Penal Code, Sections 19.02 and 15.02.

All in violation of Title 18, United States Code, Sections 1959(a)(1) and 2.

## COUNT FIVE

### Conspiracy to Commit Murder in Aid of Racketeering

91.  The allegations of Paragraphs Eighty-Four and Eighty Five are hereby re-alleged and incorporated as if fully set forth herein.

92.  On or about November 9, 2009, in the Western District of Texas, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the Texas Syndicate, and for the purpose of gaining entrance to and maintaining and increasing position in the Texas Syndicate, an enterprise engaged in racketeering activity,          . **ERVEY SANCHEZ, a/k/a "Mad Max," SOTERO RODRIGUEZ MARTINEZ, a/k/a "June,"**

and others known and unknown, did conspire to murder Jesse James Polanco, in violation of Texas Penal Code, Sections 19.02 and 15.02.

All in violation of Title 18, United States Code, Section 1959(a)(5).

## COUNT SIX

### Murder in Aid of Racketeering

93.  The allegations of Paragraphs Eighty-Four and Eighty

Five of Count Two are hereby re-alleged and incorporated as if fully set forth herein.

94.  On or about November 9, 2009, in the Western District of Texas, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the Texas Syndicate, and for the purpose of gaining entrance to and maintaining and increasing position in the Texas Syndicate, an enterprise engaged in racketeering activity, **ERVEY SANCHEZ, a/k/a "Mad Max,"** and others known and unknown, murdered Jesse James Polanco, in violation of Texas Penal Code, Sections 19.02 and 15.02.

All in violation of Title 18, United States Code, Sections 1959(a)(1) and 2.

### COUNT SEVEN

### Conspiracy to Commit Murder in Aid of Racketeering

95.  The allegations of Paragraphs Eighty-Four and Eighty Five of Count Two are hereby re-alleged and incorporated as if fully set forth herein.

96.  On or about August 14, 2010, in the Western District of Texas, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the Texas Syndicate, and for the purpose of gaining entrance to and maintaining and increasing position in the Texas Syndicate, an enterprise engaged in racketeering activity, **LARRY MUNOZ, JR., a/k/a "Little Larry," GEORGE SANCHEZ, a/k/a**

"Curious," SOTERO RODRIGUEZ MARTINEZ, a/k/a "June,"

BRIAN ESPARZA, a/k/a "Tata," CHARLES

ESPARZA, a/k/a "Horse," INEZ MATA, a/k/a "Bebito," and others

known and unknown, did conspire to murder Ramon Rodriguez, in

violation of Texas Penal Code, Sections 19.02 and 15.02.

All in violation of Title 18, United States Code, Section
1959(a)(5).

A TRUE BILL.

FOREPERSON

JOHN E. MURPHY
United States Attorney

By: _____
ERICA BENITES GIESE
Assistant United States Attorney